Welcome to the second day of our panel hearing here in Atlanta. Judge Rosenbaum and I are very grateful and very thankful to have with us Judge Harvey Schlesinger from the Middle District of Florida. He has been with us many times before and we're very happy that he's here once again to help us out with our work. You know the lighting system, when the yellow light goes on, that means that your time is drawing to a close. So begin to wrap up. If we take you beyond the red light, then you're on our time and not yours. So just keep going as long as we'll take you. And with regards to Mr. Steele is going in what order? First, yes. Oh, Mr. Church, I'm sorry. Because the phone number here was for Mr. Steele. I mean, yeah. Okay, okay, got it. Got it. Okay, so he'll he'll follow some. Ms. Fricklin, you're going to go first. Okay, and then Mr. Steele, and then we'll hear from Mr. Church. Okay. All right, we're going to give you some additional time for this case. So we're ready when you are. Good morning, may it please the court. Due to a conflict of interest, Mr. Medico's attorney essentially acted as a witness against him. When the government insisted on using a box of fake invoices as evidence of Mr. Medico's consciousness of guilt, a minefield of conflicts arose because it was counsel who delivered that box. It was counsel who represented to the government that they were business records of Polyplex. And it was counsel who knew that the box did not come from Mr. Medico. Everyone other than Mr. Medico himself was aware of the problem and their efforts to avoid the clear conflict of interest just resulted in more conflicts and at least two adverse effects. Why do you say that Mr. Medico, you're saying he never became aware of any, and I'm not saying he had an obligation to do anything individually or pro se, but you're saying given the court proceedings he never became aware of any issues, although he may have been in court while things were being discussed? Your Honor, Mr. Medico is not present at the initial pretrial conference on November 11th where this was brought to the attention of the court. It was discussed later during trial when Mr. Medico would have been there, but it was never presented to him as a conflict situation. Got it, okay. And Your Honor, counsel's stipulation to the box of false invoices and his statement that they were records of Polyplex ended up coming in against his client with no context. There was no cross-examination and importantly it came in without the statement that the box could not come from Mr. Medico. Then that evidence was used extensively and effectively by the government to argue Mr. Medico's own personal consciousness of guilt. Now there was a witness for the defense who testified about her involvement in the creation of the invoices, right? Correct, Your Honor. The record shows that counsel was not aware of that witness until the weekend in between trials. Counsel puts that on the record, so at the time that counsel is entering the stipulation, the record shows that he did not know about this defense witness that they ended up putting up. Okay, but the witness provided at least some information about who was responsible for the creation of the invoices, right? Yes, there was testimony about who was responsible for the creation of the invoices. And how does that play into one of the two adverse effects that you say existed due to the conflict? Your Honor, that witness did not explain how the box got to the attorney, what representations were made to counsel about the box. The witness only testified that she created it and I believe left it back in the pharmacy. So it's possible that Mr. Medico discovered the box or a co-defendant discovered the box thinking they were genuine, but counsel's stipulation allowed the government to argue that Mr. Medico and his co-defendants were in fact conscious of the fact that the invoices were not real and that that showed their consciousness of their guilt. Is there any other evidence about his guilt other than what you say the government argued about his not knowing where they came from? Your Honor, there is some evidence of his guilt, but the evidence against Mr. Medico himself is limited. I believe there's evidence that he was present during some of the cash transactions, and there was one witness who testified that he conducted one cash transaction, but this evidence was very important because part of Mr. Medico's defense was a good faith defense because he had to act willfully, and so this evidence that he had some kind of consciousness of guilt was important for the government to rebut his good faith defense. Was there any, and I know the procedural difficulties given the way the issue arose, but I'll ask the question anyways, was there any attempt to figure out who gave him the box? Your Honor, do you mean from counsel? From anybody. In the background? No, anybody during all of these proceedings, both the pre-trial hearing and then during trial when things sort of developed in a slightly different way. Your Honor, there's nothing on the record that shows that there was any inquiry. But for example, and I know this is not the case because I've looked at the relevant parts of the record and I couldn't find anything to it, but if the evidence was that Mr. Medico himself gave his lawyer the box, you would not have, nobody would have wanted to put the lawyer on for the defense, right? Your Honor, I believe that would be correct, but the facts here are the opposite because counsel explicitly stated that there should be no suggestion that the box came from his client because that is not factually correct. And he says that on page 55 of that pre-trial conference. So counsel made that clear in the record that Mr. Medico was not the one that gave him the box. If they didn't have the stipulation, the box would have never come in, correct? Correct, Your Honor. The judge was going to exclude the box, but for the stipulation, it would not have come in. Isn't the real issue though whether your client knew of the falsification? I mean, if your client, and your client's position throughout was that he didn't know of the falsification, if your client didn't know of the falsification, then what difference does it make that the documents come in? Your Honor, because the government was able to draw the inference that he did. And in fact, they explicitly argued that Mr. Medico knew because during the government's closing, they say Mr. Medico is handed the search warrant identifying exactly what the government is going to seize. They were seizing invoices and expenses, things to try to show the amount Polyplex actually paid for its goods. And then his representative provides this box of fraudulent and forged vouchers. But he said that about each one of the defendants. Her representative provided, and that's what the stipulation said. The representative of the defendants provided the box. So, I mean, the question is whether your client knew that they had been falsified when they were provided. And yes, that's an argument that the government made, but, you know, I don't understand how Mr. Medico's counsel could have testified to that anyway. How could he have testified? I think the point of our claim and the adverse effect is that the stipulation shouldn't have come in at all. So, counsel should not have been in a position to have to testify about whether or not Mr. Medico knew. I mean, it is certainly possible that later counsel had a discussion with Mr. Medico and he said, I had no idea that these were false. I didn't want you to submit them to the government at all. We don't know. But I mean, then you'd have, I mean, that your client would have wanted to waive attorney-client privilege. And then, you know, if Mr. Medico's counsel were testifying, he'd be testifying about all of that. I mean, the way that, the reason it's a problem is I think you have to show that the alleged conflict could have had some kind of negative effect on your client. And where I'm having trouble just seeing how that is so, since I don't understand how Mr. Medico's counsel would have been able to testify as to whether the doc, whether he knew the documents were false. And that's really the question here. And besides that, we have the testimony of the woman who claimed that she was the one who falsified the documents and that Mr. Medico didn't know. So, I don't, I'm not sure I'm understanding, maybe you can just address this for me, why this is, why this causes your client prejudice of any type. Sure, Your Honor. And I have to disagree about kind of what the point of our conflict claim is. The adverse effect here is that the box came in at all because it was not going to come in, or that's one of the adverse effects. But one adverse effect is that the court clearly ruled that she was going to exclude this evidence under Rule 403 and then counsel still went and stipulated to that evidence coming in. And there's no reason for counsel to do that but for the conflict. Maybe, I mean, it would be a strange trial strategy, but maybe it was a trial strategy, which would then make it, it seems to me, it's more appropriate for resolution on a 2255 because we would want to get testimony from Mr. Medico's counsel. What do you think about that? Your Honor, I believe you can resolve it on the record that you have here because once you get to the point where the court is excluding evidence against, that is pretty damaging evidence against a criminal defendant, and the court is going to exclude that, and counsel comes back and says, never mind, we're going to actually stipulate to it and let it come in and let the government make the argument and draw the inference that my client was responsible and was conscious of his own guilt. That can't be any kind of reasonable trial strategy, and there's nothing in the record. I mean, it seems like, again, I don't know what the situation is, but perhaps it could be a reasonable trial strategy. Maybe there was a thought that it would explain the $4 million gap, right, between what it was that your client charged or, you know, redeemed in WIC's certificate and what was actually paid out. I mean, maybe that would be a way of explaining all these invoices were lost and, you know, so they recreated these invoices and, you know, they didn't get them right and that explains the gap. I don't know. I mean, maybe that was what they were thinking. That's why I'm saying I wonder whether it would be more appropriate for resolution on the 2255. Sure, Your Honor, but I believe the record shows that counsel did not have that strategy because he didn't make that argument. He denied that they knew that they were false, so if that were counsel's strategy, it would be apparent from the record, apparent from his closing argument, and that's not the argument that he made, and to answer your question about whether this should be 2255, I believe the record is sufficient to show a clear conflict of interest and a clear adverse effect, but, Your Honor, if the court believes that the record is not sufficient, I believe the solution would be to remand to the district court during these proceedings and let us make the record. All right, Ms. Strickland, thank you very much. You've saved your time for rebuttal. Thank you, Your Honor. Mr. Steele. Good morning. May it please this Honorable Court, I am Brian Steele, and I represent Appellant Ms. Monica Medico, and it's the same issue that you were just discussing with the Honorable Counsel that was just here, and what happened, I was one of the trial lawyers, and what was happening is I'm the one who objected to the, what I believe we can call false invoices, if everyone is okay with that term, because I didn't want it to be argued that Ms. Monica Medico had anything to do with the presentation, the creation, or the awareness that these invoices were fake and that they were turned over to the government. Before I got in the case, I was in the case maybe, and the record will show, so I may build a law three weeks before trial, maybe a month before trial. Prior to that, there was a stipulation created at a pretrial conference, so I've always kept words of lawyers and our co-counsel, my co-counsel stipulated that these documents would come in without any further representation pursuant to a stipulation. What was not stipulated to, and as on the record, the government agreed, is that Ms. Monica Medico had anything to do with the creation of these documents or anything, any knowledge that they were fraudulent. This was bad evidence in the case. These fraudulent documents took up a lot of time. It was a big garage bag in a box filled with just fraudulent invoices, and the government agreed. It said document 188, page 727, line 17 through 20, that the government stated that we've been careful, of course, given the nature of the stipulation, as to any party's knowledge of falsity of those documents. With that, that was my understanding of the stipulation. So I was just going to go in. There's no evidence that Ms. Monica Medico had anything to do with these false invoices. Then everything shifted. Once the stipulation was agreed upon, then the government's agent testified that they, quote-unquote, pointing at all three criminally accused, provided the false invoices and knew they were false, and the government argued that continuously in their closing argument. So reacting to that, I wanted to call Mr. Fred Medico, Appellant Fred Medico's lawyer, because I had spoken with him, and it's on the record. I made a proffer, and he would testify. I was not going to ask him about any of the other parties. My mission was Ms. Monica Medico, and I was going to ask him, you're the person who provided these documents to the government? He would have said yes. And you had involvement with these documents? Yes. Did Ms. Monica Medico have any involvement with you with these documents whatsoever? No. Do you have any information, evidence from any source that she was involved with or had knowledge that they were fraudulent? It would be no. Those are not my quotes, but I made a proffer. Who did he get the box of documents from? It's not in the record. I do know the answer to that. You put them on the stand, and you ask them your questions. The government gets to cross-examine. I agree with that. Right? And so that's a minefield for everybody, and I'm not saying it's a minefield you created. No. But it's a minefield because imagine if he says, and again, I'm hypothesizing. I'm not saying this is a state of affairs. Imagine if he says, my client gave me the box. Well, then you've got mistrial left and right and center when you have a lawyer testifying against his own client on the stand. So you've got all sorts of problems. And so that's the reason I'm asking you, did the proffer go further in knowing the details of where he got the document from? Because otherwise, wow. So understanding all that, and that was clear to me at the time, I agree with you. I asked the honorable district court judge to please sever because I understood that's an issue, and that would have been a, I'm just using your term, a minefield that would have exploded. So I believe that the district court respectfully denied Ms. Monica Medico's opportunity and constitutional right to call a critical witness. But even so, I mean, let's just say Mr. Medico's counsel, he testified the way you said. That doesn't show that your client wasn't involved or didn't know that they were falsified, right? I mean, it's not exculpatory evidence. Would you agree? No, I think it's exculpatory. Now, it may not go as- He would have explained all of his involvement with the false documents, and she would have not been involved whatsoever with them. I understand he would have also potentially- All he could explain was that somebody in the company made these false documents. He could explain how many times he discussed the false documents, I'm not saying for hearsay, who he discussed them with, how he got the documents, why he provided to the government, what assurances was he given without saying- Yeah, but wasn't the government's theory that some clerk in the company made these false documents up? They had to be made up because somebody directed them to do it. The clerk just doesn't willy-nilly start creating false documents. Have you tried any cases other than this one? No. Well, isn't that the way the WIC credit cards in, and they only had $100,000 in inventory brought in, so somebody made up $900,000 worth of false inventory documents so it can balance out a million for a million? But in this case, Ms. Monica Medico's defense didn't rely upon that. She's a true clerk at the store. She's not a principal. Counsel, isn't your client on video and audio buying the WIC vouchers and looking sort of stealthily around to see if she's being watched? I mean, isn't there evidence of her actually interacting with somebody who's acting on behalf of the government? And we acknowledge that, and they are in a pretty high crime area. They're dealing with cash. They would not show the cash is going to a person paying for the WIC vouchers, and Ms. Monica Medico's defense was that, yes, I bought those WIC vouchers. I did not know you cannot purchase the WIC vouchers, and the government acknowledged that. Everybody acknowledged that. That was her sole defense, and then the government used the false invoice to say the cover-up proves she had knowledge. I think it was more of a mouthful, wasn't it? She spoke with the government at the time of the search warrant and afterwards, and at no point did she ever say, yes, I bought them, but I didn't know that you couldn't buy them. In fact, she pretty much said the opposite, that no one was buying them. Isn't that what the record shows? That wasn't that bad of evidence. What happened was, and it's all on video and captured, what happened was she was told before the interrogation began that it is unlawful to buy, to purchase WIC vouchers. Knowing that she's purchased WIC vouchers, she was told it's committed a crime. Now tell us that you purchased WIC vouchers, and she lied. We acknowledge that. Jurors would forgive that because it put upon her the knowledge at that time of something she didn't know about before. That's a triable case when you bring in these vouchers that are clearly fraudulent. I mean, this court has done so many cases. That was the death of this case for everybody. Then there was no getting around it, and I believe that the trial counsel for Ms. Modico at a severed trial should have been allowed to testify, and it denied Ms. Modico her constitutional right, and it's not harmless beyond a reasonable doubt. All right, Mr. Steele, thank you very much. You saved your time for rebuttal. I want to thank the time, of course. Okay, Mr. Church, are you there? Yes, Your Honor. Thank you. Good morning, and may it please the court. My name is Tom Church. I represent Pauline Badiki, and I want to thank the court and the clerk's office and all the staff for accommodating my remote argument, so thanks. Ms. Badiki started Pauline Plex in 2005 to serve a community in need. A significant part of that business was providing WIC food and WIC formula to needy mothers and exchange vouchers. She set up a delivery program, and for several years, Pauline Plex served this vital function in the community. The evidence from trial shows that between 2009 and 2013, there was WIC fraud going on at the pharmacy. Ms. Pauline Badiki was charged with her brother, Fred Medico, and her sister-in-law, Ms. Monica Medico, based on what happened in that timeframe. The evidence at trial also showed, however, that Ms. Badiki had taken a step back from the business. She had sold it to her brothers, and most importantly, that she was not around during key moments when the government was trying to display or demonstrate that fraud was happening at the pharmacy. For example, there were multiple inspections by WIC. There was a search warrant executed by the government. There were three undercover buys, and Ms. Badiki was not present for any of these. There were multiple witnesses who worked for the pharmacy who testified she was rarely there during this timeframe, and there were even government witnesses involved in selling their WIC for cash who either said she was not, that Ms. Badiki was not involved in those transactions, or they weren't familiar with her. But aren't those, Mr. Church, aren't those inferences to be drawn from the evidence, and aren't there contrary inferences that could be drawn as well? Your Honor, certainly, circumstantial evidence can be sufficient to support a conviction, and that is based on inferences that can be made. But here, we have several different categories that the government put forward to draw these inferences from, because it's undisputed. There was cash for transactions going on. So the government focuses on the fact that Ms. Badiki knew the WIC regulations. She had signed several forms applying or maintaining WIC status for Polyplex, but that does not support a reasonable inference that she knew that people at the pharmacy were committing fraud, especially if she wasn't there. There was also evidence the bank account, and they also emphasized the disparity between the inventory and the Polyplex vouchers. The problem with that is it's not just one inference the government asked the jury to make. They were asking the jury to infer that Ms. Badiki, because her name was on the bank account and because there were, I think, two instances of her making deposits, that she must therefore know exactly what was going on with the fraud. But the problem is that's not just one inference. You're asking her jury to infer that she knew about what was going in and out of the bank account, and that disparity would be enough to put her on notice. But that being said... Well, how would you characterize her job or status at the company during the relevant time period? Your Honor, she was certainly still involved in some capacity. She was there at the pharmacy on some occasions working as a pharmacist. She was a licensed pharmacist, although I think there was a period where her license had been suspended. So it's not a position that she completely divested herself. In fact, there was a purchase agreement with her brothers. She still had a stake in the business. That is clear. But the question is what kind of insight did she have to know that there was fraud going on? And the government emphasized the deposits that she made, which involved fraudulently purchased vouchers. But Agent Fred McCree, who was the lead agent in this case, testified there was nothing on the face of those vouchers that would show they are illegal. And we also had evidence that there were several legitimate transactions. So I don't believe there's a reasonable inference there. But Your Honor, I would like to touch on... It seems like you're taking these pieces of circumstantial evidence and then knocking each one down. But when you look at it all together, she's still, for lack of a better term, a principal in the firm, even though you say she's backed away a little bit from management. She's involved in some of the deposits. She purchases some of the So when you start putting all that together, it starts looking a little more difficult for her. Certainly, Your Honor, there is a difficult standard to meet when you're talking about the sufficiency of evidence in a conspiracy case. The issue here, though, is that, and I think we fleshed this out in more detail in our brief, all of these inferences, even together, do not rise to providing an instance that she had actual knowledge that she was... So the standards that this court has put forward are there has to be at least enough circumstantial evidence to support their inference of a meeting of the minds. And that's a very specific phrase that implies a direct sort of knowledge. And Your Honor, if I may turn to the role enhancement, but first ask the court how much time I have remaining. I did forget to start my timer. You've got about two minutes and 15 seconds, so go right ahead. Thank you. The issue with the role enhancement, the record reflects on page 53 of the appendix. The initial PSR didn't recommend this. There was a heightened focus by the government on Ms. Baddicki's control of the finances, her aim on the bank account to provide cash, checks to the company. But that is simply insufficient because, as this court has made clear, it's about control or authority over other participants. And I would direct the court to the case we cited, Harness, that's 180S3-1232, 11th Circuit, 1999 case. And I emphasize that there the court found it was plain error for the district court to apply the role enhancement. In a very similar case, actually, there we had the director of an organization that was involved with HUD program. The director defendant had check writing authority, was an accountant, was responsible for maintaining records. But the court found that that was insufficient because there has to be a control over participants. And here, there wasn't that. And, in fact, it looks like the court relied on Stinson, an unpublished opinion by this court that we cited in our brief. But there, that's a very distinguishable case. The owner defendant was directly involved in how to engage in these transactions. The defendant's owner got the prices. Here, that was a co-defendant, as the record shows. And regarding Tracy Robinson, who is arguably the only participant the government could base this role enhancement on, the district court did not make any findings or facts as to credibility. The court just cited Stinson. So it seems to be that the court did not rely on Tracy Robinson's position. And either way, it has to be remanded if there are no credibility findings. But our position is that there simply was not authority or control over other participants. Thank you. All right. Thank you very much. Thank you, Your Honor. May it please the court, Elizabeth Hathaway for the United States. I'd like to start with Mr. Medico's Sixth Amendment claims. In order for this court to reverse his conviction, Mr. Medico would have to show that his counsel had an actual conflict of interest, not a hypothetical, an actual conflict of interest, that he actively represented two conflicting interests. Well, let me give you, and I know this is not in the record because it wasn't developed, but if he had gotten the documents from his own client, would there have been a conflict? So I guess my question to the court is in what sense? He got the box from his client. His client says, here's a box of invoices. Please give them to the government. And he unknowingly gives them to the government. What do you mean unknowingly? He takes the box and he gives it to the government. I'm sorry, Your Honor. He didn't know that they were fabricated documents. He didn't know anything. He just takes the box that his client gives him and does what his client instructs and gives it to the government. That's right, Your Honor. Understand that, no, Your Honor, I don't think he does. That is doing what defense attorneys do all the time in response to subpoenas from the government or if their clients want them to provide documents to the government. There's no allegation here, and even in Your Honor's hypothetical, that the attorney knew, that the attorney somehow believed they were committing a crime, that they might be investigated by the government, that they had... I'm not talking about the crime fraud exception to the attorney-client privilege. I'm talking about a conflict for Garcia purposes. That's right, Your Honor, and I'm not either. I'm talking about an attorney who may feel that he now or she may be investigated by the government, that they have their own interest in... But the government is now going to argue and did argue that these were fake and fraudulent invoices, that they came from representatives of the defendants and the defendants knew that they were fake and fraudulent. Still no conflict for you. Not if the attorney doesn't have any knowledge otherwise. He just provided the documents to the government. Yeah, but did you actually try the case? I did not, Your Honor. Well, if you were trying a case and a lawyer gave you a box of false documents and you were the prosecutor, it wouldn't dawn on you maybe that this guy has to be a witness to testify where he got the documents from? No, Your Honor, because the witness would have been the government agent, the individual who picked up the documents. So the government agent went to Mr. Morris's office and picked up the documents. Yeah, but of course, that lets you get the document, the box in, but what's the next question in anybody's mind if the agent testifies to that effect? The government wasn't going to ask another question. Of course, you're not going to ask it. Anybody in a courtroom would be thinking, oh my God, because the government's next argument or next question to the agent is, were the invoices false? False. Yep. Do you think the defendants knew they were false? Yep. And so if the agent testifies that he got them from the lawyer, everybody and their mother's going to be thinking, did the lawyer know? That's right, Your Honor, but the government still could have asked, did you get this from a representative of the defendant? The same thing that was essentially stipulated to in this case. Did you get it from a representative of the defendant? Did you get it from a representative of the pharmacy? While no one is able to ask who they got it from. Did anybody sit down at that particular time and say to the attorney, I want you to continue representing me in this case and do whatever you have to so that the judge doesn't toss you out? I heard from one of the lawyers, he came in the case three weeks before it was tried, so obviously there was not a long-term attorney standing around. Maybe this man represented Medico for a long period of time, and Mr. Medico didn't want him off the case, so they worked something out. Nobody here knows what the discussion was. I think you said that the stipulation was entered into before you came into the case. You didn't try the case, so how do we know what really went on between the prosecutor and the defense attorneys in reaching this stipulation? So, Your Honor, Mr. Morris did represent Mr. Medico for a lengthy period of time. You're correct, though, there's not a good record on what exactly happened, which is going to, I think, Judge Rosenbaum's point that generally these kind of issues are decided on a 2255. Let the district court build a record, a record that may have not been appropriately made at the trial, pre-trial, but let's have a record to find out what happened, what did Mr. Morris know? There's really no evidence as to what he knew personally. You know, this all seems too convenient for the government, and it may not lead to a certain outcome in this case, but the government took the easy way out. They're like, we don't care about the lawyer. We don't care whether the lawyer knew or didn't know. He's going to be a conduit to getting this in, and then if the judge, if you're a defense lawyer and the judge trial strategy leads a defense lawyer to say, Judge, don't worry about keeping it out. I'll stipulate so you can put it in. Can you give me any possible reason? The fact that, the fact that this attorney prior to that point, up until the point, kept saying that he was going to stipulate to the foundation, he was going to enter in the stipulation. It wasn't until the morning of trial, when the defense team filed a joint motion to exclude the document on 410, right, so not on the basis that the court ultimately ruled on. It wasn't until after the jury selection actually had completed, that there was argument on it, it was filed that motion, that at that point, the attorney, much like Mr. Steele, as someone who kept his word, thinking up until that point that the documents were going to come in, there was no suggestion that they weren't up until that point of trial. He stuck by his word, and the trial strategy, I don't know, but if I'm a defense attorney who believes that those documents are going to come in anyway. How would they have come in anyway? Because the judge is up until that point, before the defense moved to exclude those documents. There was no stipulation at the pre-trial conference? None had been entered into at that point. They were in discussion. Where did things stand at the end of the pre-trial conference with regard to the box of invoices? Where they stood is that the government counsel had indicated, had been talking to the defense attorneys on the case about it, that they were near a stipulation. Mr. Morris, the attorney for Mr. Medico, indicated that he would sign that stipulation. Ms. Medico's attorney had indicated that he would sign the stipulation, and Ms. Bedicki's attorney said that he needed some more time to consider it. So at that point, it appeared that the documents were coming in, that the government could lay a stipulation, and that the documents were coming in, and that the government could lay a stipulation. And so what happened was that the defense attorney, not to do exactly what the court is suggesting, is to point the finger exclusively as to Mr. Medico by implicating his attorney, for whom there was no indication that he knowingly, knowing that the documents were fabricated, then gave them to the government. And so what appeared to be a balance was, rather than drawing that inappropriate inference, that we would stipulate, both parties, the documents did come on behalf of the defendant. So they were business, purported business records from the pharmacy. Let me ask you a question though. So you're supposing that the reason that defense counsel went ahead and stipulated was because they wanted to keep their word. Did I understand that correctly? To keep their word? Yeah. Yes, Your Honor. Okay. So doesn't that present a conflict of interest because they're concerned about keeping their own word as opposed to representing the defendant figuratively? Your Honor, I don't think that creates a Sixth Amendment conflict of interest at that point. Attorneys make those kinds of trial strategy decisions all the time that perhaps I'll stipulate here and argue there. There could be a number of reasons for that. Again, we don't have the record to show why it was at that point that the counsel continued. Although I would argue, Your Honor, that that's not of counsel claims for which the defense would have to show prejudice from that. Okay. Now, one other question. Your friend on the other side suggested that instead of waiting for a 2255, we could just send this back on a limited remand to have the court conduct whatever kinds of evidentiary hearings needed to be conducted in order to make the necessary record to decide whether there was actually a conflict, etc. Is there some reason that you think we should not do that? But Your Honor, it's not the general practice of the court to do that. And this court generally doesn't hear ineffective assistance counsel claims on direct appeal, deferring those to the 2255. So when you ask legally, can that happen? Of course, this court absolutely could do that. But I don't think the court should. I think there are sound reasons why courts generally don't hear ineffective claims or conflict claims on direct appeal. I'm sorry. In this case, Your Honor? In this case, so we are here. I think, I don't know, Your Honor, if it would make a tremendous difference because the outcome is going to be the same, right? The district court would hear a ruling on it. But I don't think because here the defendant has provided enough, has created the record enough to allow that process, let him, he has an avenue, a legitimate avenue in the 2255, that that would be the appropriate way to resolve the case. Do you know if the defendants are Adam Bond? I don't know if they are. I believe they're probably in custody, Your Honor. All right. So let's talk about Ms. Medico's argument, which is somewhat the same but different in other ways. So the government is going to make the argument and made the argument that the box of fraudulent invoices came from representatives of the defendants, plural, right? That's correct, Your Honor. And then argued from that inferences to the jury about guilty knowledge, right? That's right, Your Honor. Okay. So Ms. Medico wants to come from her. And she's not allowed to put on the testimony of the conduit for the box. So why isn't that a problem? So again, Mr. Steele says now that he moved to sever. Forget the severance. Okay, yes, Your Honor. He won't. You have put on affirmative evidence, and let's assume it was all done properly, correctly, everything. You put on evidence through the stipulation and the testimony of the agent that this box comes into the government's possession, and it comes from representatives of the defendants, plural. And you are going to make the argument to the jury, and you did make it, that all of them were responsible, or all of them knew, right? So Ms. Medico wants to put on evidence from the conduit, the person who turned over the boxes, that whatever else the from her. That may not be testimony that completely puts her in the clear, but it certainly helps. So why warn her rights infringe by not letting her call Mr. Medico's counsel? Mr. Medico's counsel. Or why didn't you stipulate that the document, the box didn't come from her? The government didn't know where the box came from. The government just knew that it came on behalf of the pharmacy, and on behalf of the defendant, as a plural. I'm sorry. Nobody thought to ask? I mean, everybody's dancing around this issue, and it's ready to blow up. And everybody's sort of dancing around. The government's like, the lawyer didn't know. We're not going to ask. We're not going to press. No Garcia hearing needed. Nobody knows. Well, there's, notice that the attorney has exculpatory evidence. That is exculpatory evidence. The box did not come from her. Like I said, that doesn't get her completely in the clear, but it's certainly an argument that a defense lawyer would make to a jury. Hey, that box didn't come from her. So whatever else you think of the other two, she wasn't involved with it. But there's nothing in the record to indicate that the box did not come from her affirmatively, that the attorney knew that. Well, all you can do in a situation where the district court excludes evidence is put in a proffer of what that evidence would have been. I haven't gone back to look at every piece of the record, so I don't know. But Mr. Steele says that he proffered that Mr. Medico's lawyer would have testified that the box did not come from his client. Is that accurate? His proffer was your honor. Do you have any information that Ms. Medico had any knowledge, involvement, consent in any party to a crime, any conspiracy, anything to know what's in those documents? And I believe that answer would be no, I do not. Okay, that's exculpatory. His answer is he doesn't have knowledge. It's only exculpatory if he would have the knowledge of who did make those documents. No, that would make it more exculpatory. But it doesn't mean it's not exculpatory at all. Lawyers ask that question all the time. Do you have any knowledge of X? No, I don't. And then the lawyer argues absence of evidence means X or Y or Z. But only if the person is in a position to know your honor. Okay. I don't know whether she was involved. You could ask me whether I have any knowledge. But you didn't turn over the box. I didn't turn over the box, but all we know is that he turned over a box. That's very different than saying, do you know that she is not involved? But then you want to inferentially argue that three of them are guilty because somebody created these false invoices with no direct testimony that any one of the three defendants were involved in based on a stipulation that she agreed to, that these were presented on behalf of the pharmacy. Which is part of the problem. Which is part of the problem because as I sit here today, I cannot think of a valid reason, a strategic reason why a defense lawyer who thinks that this box is going to get excluded on rule 403 grounds will stipulate to admissibility. And yet all three did. You may think the judge got it wrong, but you're like, I'm not complaining. This stuff is not coming in. I have a duty to my client. I'm not going to stipulate to anything. Then the government doesn't get the box in because then the lawyer has to be called. Correct. This is a mess. But all three defense counsel agreed. All three stipulated. And I think the evidence shows that they also had the witness who testified, Ms. Okole, who testified that she created the document. And nobody asked her who she gave the documents to. And nobody asked her who she talked to about the documents. And everybody stayed away from those questions. I think, well, she said she told Mr. Medico about a week before trial. Right. But not at the time of creation. Well, she indicated that they didn't know that she had created them at some house party that she had. She wasn't supposed to bring them home. Was there anything that stopped the defendant in doing their direct examinations of her or their in asking what she did with the document? I mean, could that, in other words, could the defendant have asked her the question, essentially, that they weren't able to ask the attorney for Mr. Medico? Yes, sir. I absolutely could have asked her those questions. And I think Mr. Morris did ask her some questions as well. Ms. Medico did not question her at all. But yes, they were free to ask her to confirm that their clients had nothing to do with the creation of the documents, that she hadn't told them about the documents. And in fact, her testimony was she didn't tell Mr. Medico or Ms. Bedicki until about a week before trial, which is well after the documents had been turned over. So they had another witness. They had information to rebut the government's that those documents had been fabricated. The government's had other information to indicate that that wouldn't be correct, that they are responsible, that, for instance, Ms. Bedicki was writing the checks to the vendors. And the testimony in the fabrication was that some of these, one of these vendors at least, said Polyplex was not even a client of ours. We never gave them anything. So the government could still argue other inferences. But yes, they were free to argue, excuse me, to ask Ms. Acola during her testimony, all kinds of questions demonstrating that they did not know that she had created those documents. Did the district court have any obligation to conduct a Garcia hearing? Your Honor, the district court has an obligation if it's apparent that there is a conflict. And at that point, nobody was raising the conflict. At the point this came up in the pretrial conference, I think there was an assumption that these documents were coming in. And Mr. Morris, at that point, had indicated that he was going to stipulate to them. Again, we don't know what's his knowledge. When did the district court learn that the box of documents came from the attorney? At least by the pretrial conference, about maybe three weeks before trial, Your Honor. And then when are all the discussions and motions about having the lawyer testify? When do those come up? They come up the first day of trial. Okay, so at that point... I'm sorry, I'm sorry, let me correct that. Because in the pretrial conference, the government does state, it recognizes that there could be an issue of having the attorney testify. And that's what we're trying to avoid is having the attorney testify. I want to say that happened at the pretrial conference. So at the time that there are more wranglings about whether or not the attorney can testify or not, for example, when Ms. Medico's lawyer wants to call her, any obligation to conduct a Garcia hearing at that point when the lawyer is a potential witness? So that's occurring, I think, the second or third day of trial that this comes up. And now we have a separate issue because it's not a conflict. She wants to call him. Again, it's not clear that... Nobody knows what he's going to say, except that he's going to say he didn't get the box from her, from Ms. Medico. Heaven knows what else he's going to say when he gets crossed because the government is not going to let him get off the stand by just saying that. They're going to cross-examine him. Who did you get the documents from? What do you know? What did they tell you? And it's going to go on and on and on. So my question is, did... And I don't know what the answer is. Did the district court have an obligation at some point when all this stuff was happening to have a Garcia hearing with Mr. Medico? Your Honor, I don't think that they did because I don't think... At that point, it was still a vague and unspecified conflict. It wasn't clear what it was that he was going to be able to show. Mr. Steele, he says today he would have asked Mr. Morris, where'd you get the documents? Who'd you get it from? And he would be able to say it wasn't Ms. Medico. That's not in the record. The defense isn't bringing that to the court's attention. He hasn't brought that, in that sense, to the court's attention. He did say that he would proffer, that he would call the attorney as a witness. He would ask him how he got in possession of the box of fraudulent documents. He would ask him, do you have any information at all that Monica Medico had any knowledge, involvement, consent in, any party to a crime, any conspiracies, anything to know within those fraudulent documents? And I believe the answer would be no, I do not. So, I mean, he did proffer. He proffered, but we still don't know the basis of what Mr. Morris, why he would say that. For instance, if his client said, I turned over the documents, I produced these documents, and he got them directly from his client, who is Ms. Medico's husband, there's still a lot of conflict. Your point is that he may or may not have had a conflict, we don't know. Is that your point? Or are you saying that there was, you know, there was no reason that the district court should And at that point, when Mr. Who's going to raise it? If the Garcia hearing is for Mr. Medico's benefit, who's going to raise that? The lawyer is going to say, Judge, I have a potential conflict. You hope that this happens, but it doesn't always happen in practice. Judge, I've got a potential conflict because I turned over the box and the government may think that I was a conduit with guilty knowledge. And so I may be in the government's client to see whether he still wants me to represent him. Mr. Medico doesn't have the knowledge, the legal knowledge to be able to make that motion in front of the district judge. And the lawyers for the other two clients have no interest and no duty to speak up on behalf of Mr. Medico. Sometimes lawyers for co-defensives will do something like that, but they usually don't. And what's interesting here, though, is that Mr. Morris almost, almost did what Your Honor said, because the first thing he did is stand up and say, I wasn't involved in the document. And the government's not saying that I was involved in the fabrication. So to the extent, to use Your Honor's hypothetical, that he may feel a conflict based on his own liability, that was taken off the table immediately. And in fact, the district court said, I don't think you were involved. But do you understand why this all just feels like wrapping everything with a nice pretty bow? The lawyer says, the government doesn't think I have any involvement. The government is perfectly happy to say the lawyer doesn't have any involvement because the government's going after the three targets sitting at the defense table. And by not accusing the lawyer of anything, they avoid all sorts of issues. They have their stipulation of the box of records coming in. So you eliminate the Garcia hearing, you eliminate any conflict, and still nobody knows where the box of documents came from. It doesn't give you any sense of concern? Your Honor, again, I think what you're raising is issues that this court generally leaves for a 2255. But let's build that record. But it's not just all ineffective assistance. It's not just all ineffective assistance. It is not all collateral. But it is hypothetical. We don't have the record at this point that there was exculpatory evidence on Mr. Morris's. Right, but that's one of my questions. Did the district court have an obligation to make a record with regards to a Garcia hearing and ask the government about its view of Mr. Medico's lawyer? You don't think so on this record? I don't think on this record. There's no indication that the government believed that Mr. Morris was involved in the fabrication of the document. And the court actually, again, stated that it specifically did not want there to be any inference that any officer of the court had done anything wrong. But the issue that they raise is that he may have provided information to the jury that their client had nothing to do with the transmittal of these false documents. And that's what they were prohibited from asking. Because he's still representing a defendant, and it can't be called as a witness by the defendants. That's right. But that is assuming a lot on their part that he would have that kind of exculpatory evidence, and that he would be the only witness who could testify. In the profit that Judge Rosenbaum read, the last thing was, my client had nothing to do with it. That's what the judge was told. And the question is, once that signal was sent to the judge, was there an obligation to have a Garcia hearing to determine if this attorney could have provided complete exculpatory testimony to one of the three defendants? And Your Honor, I could make one slight comment first. The evidence proffer wasn't that Ms. Medico had no knowledge. It was he did not have any information that she had that knowledge. It's slightly different, but it assumes he has the information at all. And again, the defense had put up a witness who testified about how those documents were created, and testified that Ms. Medico was not involved in them at all. So he had the exculpatory witness. That testified at trial. Yes, Your Honor. And I see that my time is nearly over. Your Honor, I think in this case, the defendant has not shown at this point an actual conflict of interest. At best, there's still a record to be made on that issue. So for that reason, I'm asking, and for all the reasons stated in our brief on the other issues as well, we would ask the court to affirm the convictions and the sentences of the defendant. And we'll rest on the brief. Thank you, Your Honor. Thank you very much, Ms. Hathaway. Okay, Ms. Strickland. All right. Your Honor, just to get this out of the way first, while I do believe there's a sufficient record in this case, this court has remanded in this situation, specifically in conflict claims, instead of waiting for a 2255 when Mr. Medico may or may not have counsel. I can point the court to U.S. v. Williams, 902 F. 3rd 1328, and that is a 2018 case where the court did remand to the district court to hold a hearing on the conflict. Do you know if the defendants are out on bond? They are not, Your Honor. They are incarcerated. Yes, Your Honor. Can I ask you a question? Why wasn't it sufficient to ask Ms. Onishi who testified about fabricating the documents, why wasn't it sufficient to ask her all the questions about what she did with them, etc.? Wasn't she the defense's witness? Your Honor, she was a defense witness, and I have a couple of responses to that. Number one is we don't know that she could have provided any testimony about how the box got to Mr. Morris. The other thing about... We don't know that because you didn't ask. I'm sorry, Your Honor? We don't know that because you didn't ask. That was not asked, and just to be clear, I was not trial counsel, so I'm not why that was... I'm not criticizing trial counsel. I'm just trying to understand if your client had an opportunity to get the evidence that you are suggesting she should have been able to get in in another way. That's all I'm wondering. Sure, Your Honor, and I mean, I would make the assumption that because that was not asked that that was not within her knowledge, and again, that witness... I mean, she would know what she did with the documents, right? Yes, Your Honor, but I believe the testimony was that she left them in the pharmacy. I don't think there's... There's no testimony about how they got from the pharmacy to Mr. Morris and whether the defendants had knowledge of that in spite of the fact that the government got to argue that inference, but what this all comes down to, Your Honor, is that witness should not have had to testify because the box shouldn't have come in at all. I mean, this is about as clear as the conflict as you can get. The government admits that counsel... But the government... But the box would have come in. No matter what, it would have come in. What it would have led to is a severance of trials because the sequence of events would have played out this way. Tell me where I'm mistaken. No stipulation. The judge says, I don't want a lawyer for a defendant to testify in a trial. The government's like, we want this information in, and so now the judge holds a Garcia hearing. There's an alleged conflict, whatever. I'm going to replace you. New lawyer comes in. Trials are severed. Lawyer gets called as a witness. Documents come in with the lawyer's testimony and the agent's testimony. Your Honor, I don't believe we can speculate about what would happen if Mr. Morris had been removed from the case because, I mean, I can point to the Supreme Court's jurisprudence on choice of cases differently. Things might not have played out the way that they did. There might not have been a trial at all. But the point that brings me to, Your Honor, is... I'm sorry, make your point and then I'll have a question for you. Sure, Your Honor, is that this all could have and should have been solved well before trial. The government knew for two years that it wanted to use this information and that Mr. Morris was the one that delivered it and was there for a witness. Mr. Morris, instead of bringing that to the attention of the court, as they had a duty to do, they just went along and created this mess and no one ever asked Mr. Medico if he was comfortable going forward with that counsel, if he wanted new counsel. None of this should have happened. We shouldn't be before you with this claim. And that's exactly why, you know, the Supreme Court said in Strickland that this kind of claim is not a Strickland prejudice claim. It's an adverse effect claim because counsel and the court can make an early inquiry to avoid this situation. That brings me to my question that I have for you. This case was pending for four years, right? And how far along the timeline were the documents produced? Your Honor, I believe that they were produced two years before the trial. The motion to exclude wasn't made until the morning of trial. Why isn't that too late? Your Honor, well, the court entertains the motion and I think the court has the discretion to do so at any time. The court did not deny it on timeliness grounds. So I agree that it should have been brought forward before and all of this should have been handled before, but none of that is Mr. Medico's fault and he is the one that is suffering and currently in prison because no one did anything about this clear conflict of interest and counsel put his own reputation, his own keeping his word above his duty to his client and he just can't do that. That's clearly a conflict of interest with an adverse effect. And so, Your Honor, I believe that this case should be Mr. Medico's convictions and sentences should be vacated on that basis without a remand. All right, thank you very much. Thank you, Your Honor. Mr. Steele. Thank you so much. Ms. Medico has completed her in-custody portion of her sentence. With regards to what the Assemble Court read, there were actually two proffers. It's three pages earlier. It's a document 188, page 725, line 6 through 14. And I also stated the following to the Honorable District Court, but the truth is I'd like to call a witness and the witness on barred from calling. I understand your ruling and I understand why it would create a mistrial at least for Mr. Medico because the witness is Bruce Morris. How did you come in contact with these documents? What did you know about who gave you the documents? What did you know about my client knowledge knew about those documents? And I think that's all exculpatory. I know that to be exculpatory, but I cannot do any of that. The witness who did testify at trial, her name is O-K-U-L-I. She stated that she created the false invoices. She never stated anything about Ms. Medico. She had no knowledge and not responsible for any transition to the government. And the government argued that. And the government said, knowing that false invoices Ms. Medico had them delivered to the government, that shows her guilty knowledge. That is the entire point I want to call the trial lawyer. With regards to the District Court, the only reason District Court stated that it would exclude the false invoices is under 403 because I was saying I'm calling a lawyer. And she said, that's just too complicated to have a lawyer here and I'm not severing the parties. I'm not going to grant a mistrial like I asked. The pre-trial conference, I was not at. Did the stipulation say that the documents were submitted on behalf of the defendants or on behalf and name the corporate pharmacy? Both. It's a stipulation. It says a representative on behalf of the defendants. Later stipulation represented on behalf of and it's called polyplex, but it's the false. That's how it read. Okay. Thank you very much. Okay, Mr. Church, you get to finish up for us. Thank you, Your Honor. Given that the government did not address our issues or arguments in their presentation, I don't think there's anything for you to rebut. So unless there are questions from the court regarding the issues we raised, we've addressed on our written submissions. All right. Thank you all very much. It's been helpful.